IN RE HUNTINGTON BANCSHARES INC.     Case No. 2:08-cv-0165
ERISA LITIGATION

                                     Judge Gregory L. Frost
This document relates to:            Magistrate Judge Terence P. Kemp

No. 2:08-cv-0175
No. 2:08-cv-0197

## OPINION AND ORDER

This action was brought pursuant to Sections 502(a)(2) and (a)(3) of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3).  The

matter is currently before the Court on Defendants' Motion to Dismiss the Consolidated

Amended Complaint (Doc. # 48), Plaintiffs' Memorandum of Law in Opposition to Defendants'

Motion to Dismiss (Doc. # 50), Defendants' Reply in Support of their Motion to Dismiss (Doc. #

56), Plaintiffs' Notice of Supplemental Authority in Opposition to Defendants' Motion to

Dismiss (Doc. # 57), Defendants' Supplemental Memorandum Addressing Plaintiff's Notice

(Doc. # 58), Plaintiffs' Reply in Support of their Notice of Supplemental Authority (Doc. # 62),

and Plaintiffs' Request for Oral Argument on Defendants' Motion to Dismiss (Doc. # 63).

For the reasons set forth below, the Court **GRANTS** Defendants' Motion to Dismiss and

**DENIES** Plaintiffs' Request for Oral Argument on Defendants' Motion to Dismiss.

## I.  Background

This lawsuit was filed by former employees of Huntington Bancshares Incorporated

("Huntington") on behalf of themselves and others similarly situated who participated in the

Huntington Investment and Tax Savings Plan ("Plan").  Plaintiffs claim that Defendants

breached their fiduciary duties to the Plan participants on July 1, 2007, when Huntington merged

with Sky Financial Group, Inc. ("Sky Financial") and continuing to the present ("Class Period"). Plaintiffs allege that Huntington's risk of loss greatly increased by subjecting Huntington to $1.5 billion of subprime[1] exposure through Sky Financial's relationship with Franklin Credit Management Corp. ("Franklin Credit").

On May 14, 2008, the Court granted the parties' motions to consolidate and this action was consolidated with *Cedarleaf and Moening v. Huntington Bancshares, Inc.*, Case No. 2:08-cv-00175 and *Uberti v. Huntington Bancshares, Inc.*, Case No. 2:08-cv-00197. (Doc. # 30.)

On August 4, 2008, Plaintiffs filed the Amended Complaint. (Doc. # 42.) In response, Defendants filed Defendants' Motion to Dismiss, which is currently at issue. (Doc. # 48.)

**A. The Parties[2]**

**1. Plaintiffs**

Plaintiffs Nathan Cedarleaf, Aileen M. Moening, Hilda T. Riccio, and Carol Uberti were participants in the Plan and held Huntington shares in his or her retirement investment portfolio during the Class Period.

---

[1]The term "subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios." Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd., Subprime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services, Mar. 27, 2007, http://www.federalreserve.gov/newsevents/testimony/Braunstein20070327a.htm. *See also* Amended Complaint, ¶ 76.

[2]The information in this Section is taken from the Amended Complaint. (Doc. # 42.)

## 2. Defendants

Defendant Huntington is a multi-state financial holding company that is incorporated in the State of Maryland, with its principal executive offices located at 41 South High Street, Columbus, Ohio. Huntington's common stock is listed on the NASDAQ and trades under the ticker symbol, "HBAN." Through its subsidiaries, Huntington provides full-service commercial and consumer banking services, mortgage banking services, automobile financing, equipment leasing, investment management, trust services, brokerage services, private mortgages insurance, reinsuring credit life and disability insurance, and other insurance and financial products and services.

Huntington's Board of Directors ("Board") is named as a Defendant in this action. The Board is the governing body of Huntington and comprises the persons who carried out Huntington's responsibilities with respect to the Plan. The members of the Board during the Class Period were Marty E. Adams, Raymond J. Biggs, Don M. Casto, III, Michael J. Endres, Marylouise Fennell, John B. Gerlach, D. James Hilliker, Thomas E. Hoaglin, David P. Lauer, Jonathan A. Levy, William J. Lhota, Gene E. Little, Gerard P. Mastroianni, David L. Porteous, and Kathleen H. Ransler.

Huntington's Pension Review Committee of the Board of Directors ("Pension Committee") is also a named Defendant. The Pension Committee is charged with assisting the Board in discharging its responsibilities with respect to the Plan. The Pension Committee is responsible for providing recommendations to the Board in connection with actions taken by the Board in fulfillment of the duties and responsibilities delegated to Huntington and/or the Board pursuant to the provisions of the Plan, and where delegated by written action of the Board, is

responsible for acting on behalf of the Board in fulfilling such delegated duties and responsibilities. Members of the Pension Committee during the Class Period were Defendants Fennell, Casto, Gerlach, and Hilliker.

Huntington's Investment and Tax Savings Plan Administrative Committee ("Administrative Committee") is named as a Defendant in this action. The Administrative Committee is appointed by the Board and is delegated the day-to-day responsibility for the administration of the Plan. Members of the Administrative Committee during the Class Period were Melinda Ackerman, Daniel Brian Benhase, Shirley L. Graham, John W. Liebersbach, Thomas P. Reed, and Wilton W. Dolloff.

Also named as a Defendant in this action is Huntington's Investment Advisory Committee. That committee is responsible for selecting and monitoring the investment options offered by the Plan. Members of the Investment Advisory Committee during the Class Period were Nancy V. Kelly, Beth Ann Russell, Robert Comfort, and Donald L. Keller.

## B. The Plan[3]

The Plan is a self-directed defined contribution 401(k) plan as described in ERISA § 404(c). 29 U.S.C. § 1104(c). To participate in the Plan, eligible employees contribute a certain percentage of their before-tax compensation to the Plan. Huntington also made matching

---

[3]In considering a defendant's motion to dismiss, it is proper for the Court to take into account any relevant ERISA plan documents not attached to a complaint where a plaintiff's claims are "based on rights under the plans which are controlled by the plans' provisions as described in the plan documents" and where the documents are "incorporated through reference to the plaintiff's rights under the plans, and they are central to the plaintiff's claims. *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997); *see also City of Monroe Employees Retirement Sys. v. Bridgestone Corp.*, 399 F.3d 651, 659 n.6 (6th Cir. 2005) (considering the impact of annual reports referenced in the complaint). Thus, the information in this section has been taken from the Amended Complaint and the Plan documents. (*See* Docs. # 42, 48, 49, 56.)

contributions to participants' accounts in cash. Each plan participant possesses his or her own individual account. All contributions, from participants and from Huntington, were allocated to the participants' accounts and invested as directed by the participant.

The Plan includes a Huntington stock option (" Stock Fund" ), which was one of up to 20 different investment choices. Individual participants were not required to select the Stock Fund as an investment choice, but the Plan mandated that Huntington stock be offered to Plan participants as an investment choice. Huntington was responsible for selecting and monitoring the investment options made available to participants of the Plan and delegated this responsibility to the Investment Advisory Committee.

Plan participants are immediately 100% vested in their own contributions and Huntington's contributions. The portion of the Plan invested in the Huntington Stock Fund is designated as an Employee Stock Ownership Plan ("ESOP"). An ESOP is an ERISA plan that is designed to invest primarily in "qualifying employer securities."

**C. Factual Allegations**[4]

Plaintiffs allege that prior to its acquisition of Sky Financial, Huntington had successfully grown its mortgage business but had not expanded into subprime lending. However, because of its merger with Sky Financial and its subprime exposure, Huntington stock became too risky to be considered a prudent investment. Plaintiffs contend that Defendants failed to take any action to protect the assets of the Plan from the "enormous, and entirely foreseeable," risk that Huntington's decision to acquire Sky Financial, and Sky's $1.5 billion in subprime exposure, would injure the Plan and its participants' retirement savings. Plaintiffs allege that this was a

---

[4]These allegations were taken from the Amended Complaint. (Doc. # 42.)

risk that each Defendant demonstrably knew or should have known because the "subprime sector" was already well into the process of collapse and because of their employment positions with Huntington.

Plaintiffs conclude that Defendants' conduct breached their fiduciary duties to Plan participants and allegedly caused over $100 million in losses to the Plan, severely effecting Plaintiffs' retirement savings.

## II.  Standards of Review

Claims brought under ERISA are subject to the simplified pleading standards of Fed. R.Civ. P.  8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (citing to Fed. R. Civ. P. 8(a)).

Defendants move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).  The United States Supreme Court has recently clarified the law with respect to what a plaintiff must plead in order to survive a Rule 12(b)(6) motion.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)).  The United States Court of Appeals for the Sixth Circuit explains:

> The Court stated that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  [*Twombly*] at 1964-65 (citations and quotation marks omitted).  Additionally, the Court emphasized that even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true."  *Id.* (internal citation and quotation marks omitted).

*Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007).

The claims must be "plausible" and not "merely conceivable."  *Twombly*, 127 S. Ct. at 1974.

With regard to the previous standard as set forth in *Conley v. Gibson* the Sixth Circuit

explained:

> In [*Twombly*], the Court disavowed the oft-quoted Rule 12(b)(6) standard of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (recognizing "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"), characterizing that rule as one "best forgotten as an incomplete, negative gloss on an accepted pleading standard." *Twombly*, 127 S. Ct. at 1969.

*Ass'n of Cleveland Fire Fighters*, 502 F.3d at 548.

### III.  Analysis[5]

Congress enacted ERISA  to "protect the interest of participants in employee benefit plans and their beneficiaries, . . . by establishing standards of conduct, responsibility, and obligations for fiduciaries of employee benefit plans and by providing for appropriate remedies, sanctions and ready access to the Federal courts."  29 U.S.C. § 1001(b).  However, ERISA neither "requires employers to establish employee benefits plans" nor mandates "what kind of benefits employers must provide if they choose to have such a plan."  *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).  Indeed, ERISA permits employers to wear two hats, acting as both an employer and plan fiduciary.  *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000).  In that regard, an employer is only subject to fiduciary standards "to the extent that he or she exercises any discretionary authority or discretionary control respecting management of the plan, or has any discretionary authority or discretionary responsibility in the administration of the plan."  *Varity*

---

[5]The facts relied upon in this Section were taken from the Amended Complaint, the Plan documents, *see Weiner*, 108 F.3d at 89, and Huntington's SEC filings, *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-361 (6th Cir. 2001) (the Court may take judicial notice of Huntington's SEC filings), all of which are appropriate for consideration at this stage of this litigation.  (*See also* Docs. # 42, 48, 49, 56.),

*Corp. v. Howe*, 516 U.S. 489, 498 (1996) (quoting 29 U.S.C. § 1002(21)(A)) (internal quotation

marks omitted).

The Sixth Circuit has instructed that:

> ERISA imposes high standards of fiduciary duty upon those responsible for
> administering an ERISA plan and investing and disposing of its assets.  29 U.S.C.
> § 1104(a)(1).  This court has explained that the fiduciary duties under ERISA
> encompass three components.  The first is a "duty of loyalty" pursuant to which
> "all decisions regarding an ERISA plan 'must be made with an eye single to the
> interests of the participants and beneficiaries.' "  *Berlin v. Michigan Bell Tele.
> Co.*, 858 F.2d 1154, 1162 (6th Cir. 1988) (quoting *Donovan v. Bierwirth*, 680
> F.2d 263, 271 (2d Cir. 1982)).

> The second obligation imposed under ERISA, the "prudent man" obligation,
> imposes "an unwavering duty" to act both "as a prudent person would act in a
> similar situation" and "with single-minded devotion" to those same plan
> participants and beneficiaries.  *Id.*

> Finally, an ERISA fiduciary must " 'act for the exclusive purpose' " of providing
> benefits to plan beneficiaries.  *Id.* (quoting *Donovan*, 680 F.2d at 271).  If a
> fiduciary fails to meet these high standards, he may be held personally liable for
> any losses to the plan that result from his breach of duty.  29 U.S.C. § 1109(a).

*Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995).  Also, fiduciaries are under an obligation

to act "in accordance with the documents and instruments governing the plan," insofar as those

documents are consistent with ERISA."  29 U.S.C. § 1104(a)(1)(D); *Best v. Cyrus*, 310 F.3d 932,

935 (6th Cir. 2002).

In the instant action, Defendants move for dismissal of all five counts alleged in the

Amended Complaint.  Each count consists of a claim of a breach of a fiduciary duty:  Count I:

Failure to Prudently and Loyally Manage the Plan and Assets of the Plan; Count II: Failure to

Monitor Fiduciaries; Count III: Failure to Disclose Necessary Information to Co-Fiduciaries;

Count IV: Failure to Provide Complete and Accurate Information to the Plan's Participants and

Beneficiaries; and, Count V: Co-Fiduciary Liability.  "To state a claim for breach of fiduciary

duty under ERISA, a plaintiff must allege that: (1) the defendant was a fiduciary of an ERISA plan who, (2) acting within his capacity as a fiduciary, (3) engaged in conduct constituting a breach of his fiduciary duty." *In re Cardinal Health ERISA Litig.*, 424 F. Supp.2d 1002, 1016 (S.D. Ohio 2006) (citing 29 U.S.C. § 1109 and *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 34 Employee Benefits Cas. (BNA) 2683, 2005 U.S. Dist. LEXIS 3715, 2005 WL 563166, at *2 (S.D. N.Y. Mar. 10, 2005).

## A. Count I[6] - Breach of the Duty of Prudence and Loyalty

In Count I Plaintiffs allege that the individual defendants who were responsible for the investment of Plan assets breached their fiduciary duties to Plan participants, in violation of ERISA, by failing to prudently and loyally manage the Plan's investment in the Stock Fund. Specifically, Plaintiffs allege that Huntington violated ERISA by acting imprudently and in violation of its fiduciary role when it acquired Sky Financial.

Count I is logically split into two sections–Defendants' conduct before and during the acquisition of Sky Financial and Defendants' conduct after the acquisition.

---

[6]The Court notes that the Amended Complaint alleges as part of Count I, that Defendants had a "conflict of interest" to the extent that they were compensated in the form of Huntington stock. However, Plaintiffs do not respond to Defendants' request for dismissal of this part of the cause of action. *See* Fed. R. Civ. P. 56(e) (non-moving party cannot rest on its pleadings or merely reassert its previous allegations). This is understandable since ERISA expressly provides that a company officer, director, or employee may serve as an ERISA plan fiduciary, and the use of stock-based incentive compensation is commonplace. 29 U.S.C. § 1108(c)(3) (ERISA's prohibitions against fiduciary self-dealing shall not be construed to prohibit anyone from "serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest"). As opposed to creating a conflict, compensation in the form of company stock aligns the interests of plan fiduciaries with those of plan participants. Consequently, the allegations regarding Defendants conflict of interest do not state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6); *Twombly*, 127 S.Ct. at 1964-65 ("a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

**1. Huntington's merger with Sky Financial.**

Defendants argue that Plaintiffs claim that Huntington violated ERISA when it acquired Sky Financial, which was allegedly overexposed to the subprime market, is simply an attempt to second guess Huntington's business decision and is not conduct governed by ERISA. This Court agrees.

The law draws a distinction between the administration of employee benefit plans and general business decisions. *See Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998). The Sixth Circuit has held that "purely business decisions by an ERISA employer are not governed by [ERISA] section 1104's fiduciary standards." *Kuper v. Iovenko*, 66 F.3d 1447, 1456 (6th Cir. 1995) (quoting *Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1163 (6th Cir. 1988)). Plaintiffs' contention that Huntington's merger with Sky Financial adversely affected the bank's financial condition simply does not state a claim for breach of fiduciary duty under ERISA. "[T]he fact that an action taken by an employer to implement a business decision may ultimately affect the security of [the] employees' welfare benefits does not automatically render the action subject to ERISA's fiduciary duties." *Sengpiel*, 156 F.3d at 666; *see also Kalda v. Sioux Valley Phys. Partners, Inc.*, 481 F.3d 639, 646 (8th Cir. 2007) (whether to pursue merger is a business decision that does not trigger ERISA's fiduciary provisions); *Martin v. Feilen*, 965 F.2d 660, 668 (8th Cir. 1992) (corporate transaction that allegedly negatively affected company cash flow and long-term financial health was not actionable under ERISA because it was purely a corporate decision). "Only discretionary acts of plan management or administration, or those acts designed to carry out the very purposes of the plan, are subject to ERISA's fiduciary duties." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000)

(quotation omitted).

Indeed, as our sister district court recently opined:

> ERISA is designed to accomplish many worthwhile objectives, but the regulation of purely corporate behavior is not one of them." *Akers v. Palmer*, 71 F.3d 226, 229 (6th Cir.1995). "If courts did not draw a bright line between ERISA plan decisions and business decisions, an entity could be liable for every decision that affects the ERISA plan, no matter how great the benefits to the business may otherwise be." *Veliz v. Cintas Corp.*, No. 03-1180, 2003 WL 23857822, at *5 (N.D. Cal. Nov.4, 2003).

*Steavens v. Electronic Data Sys. Corp.*, 44 Employee Benefits Cas. 2657, 2008 WL 3540070, at *4 (E.D. Mich. Aug. 12, 2008).

Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss to the extent Count I relies upon Huntington' s conduct before and during the merger with Sky Financial.

**2. Defendants conduct after the merger with Sky Financial.**

Initially the Court notes that the parties disagree as to whether the Stock Fund constitutes an ESOP and, consequently, whether it is entitled to a presumption of prudence, *i.e.*, a presumption that investment in Huntington stock was reasonable. *See Kuper*, 66 F.3d at1459 ("an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision"). The Court concludes, however, that in this action it is unnecessary to determine whether the presumption should apply because even it if it were not applied, Count I cannot survive Defendants' Motion to Dismiss.

The remaining issue in Count I is whether Defendants breached their fiduciary duty related to continued investment in Huntington common stock after Huntington's merger with Sky Financial. Thus, the question is: In continuing to offer Huntington stock to Plan participants, did Defendants "act with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims[?]" 29 U.S.C. § 1104(a)(1)(B).

Plaintiffs argue that the decline in Huntington stock, from over $22 to just over $7 per share during the Class Period and Huntington's deteriorating financial condition during that time shows that "a reasonable and prudent fiduciary would not have continued to invest in Huntington stock after Huntington merged with Sky Financial and acquired massive subprime lending exposure." (Doc. # 50 at 35-36[7]) (citing Amended Complaint ¶ 194.) Plaintiffs contend that "[a]n objective fiduciary would not have continued to invest any of the Plan's retirement funds in Huntington stock as it steadily tumbled and lost over 65% of its value due to Huntington's imprudent investments in subprime assets when the subprime market was in collapse." *Id.* at 4. Further, Plaintiffs argue that Defendants currently maintain that "Huntington stock is a 'prudent' investment, after the Plan has already lost more than $100 million, as the stock price continues to sputter, and as Huntington manages to avert complete failure only by pleading for a $1.4 billion bailout from the federal government." *Id.* at 19.

Defendants, however, argue that Huntington is a $55 billion company and that its merger with Sky Financial, which held more than $17 billion in assets with only $1.5 billion in commercial loans (not all subprime), simply did not constitute taking on massive subprime exposure. Indeed, these loans constituted just 3.9% of Huntington' s total loans and leases and just 2.8% of Huntington' s total assets. Additionally, Defendants contend that Huntington's

---

[7]Throughout this Opinion and Order the Court refers to the page number assigned by the Court's electronic filing system.

stock is owned by several large, public pension funds, which collectively have increased their Huntington holdings by over 137% over the Class Period, which prevents a finding of imprudence in continuing to offer Huntington stock and/or not liquidating the Plan's holdings of Huntington stock during the Class Period. Moreover, Defendants point to the unprecedented, ongoing credit crisis that has negatively impacted the stock price of banks and other corporations across the country whether these businesses were ERISA employers or not. Finally, Defendants argue that they had no duty to investigate the continued offer of investment in the Stock Fund because there were no "red flags" that should have placed Defendants on notice as to such a need. Again, the Court finds Defendants' arguments well taken.

First, the Court concludes that Defendants acted with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims" when they continued to offer Plan participants the option of investing in the Stock Fund and when they continued to hold Huntington stock (*i.e.*, not force a liquidation of the Stock Fund) during the Plan Period. *See* 29 U.S.C. § 1104(a)(1)(B). In reaching this conclusion, this Court has the benefit of a hindsight analysis in which it compared publicly available securities information to the allegations in the Amended Complaint. *See Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008) (affirming the trial court's dismissal for failure to state a claim stating: "Comparing publicly available stock prices to the allegations in the complaint allows us to conduct a hindsight analysis of whether it was in fact imprudent to continue to invest in Tribune stock."). This comparison leaves no question that Plaintiffs' allegations that the holding of Huntington stock and the continued offering of that stock during the Class Period fails to "raise a

right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 127 S.Ct. at 1964-65 (internal citation and quotation marks omitted). That is, as Defendants point out, the plan fiduciaries of large public pension funds (*i.e.*, individuals acting in a like capacity to Defendants), continued to invest in Huntington stock, and indeed increased their investments, during the Class Period. In this respect, Plaintiffs' Amended Complaint merely sets out the "formulaic recitation of the elements" of their breach of fiduciary duty based upon investment in Huntington stock, leaving the claim conceivable; however, as is shown here, it is simply not plausible. *See Twombly*, 127 S.Ct. at 1964-65.

Further, although Huntington has experienced a significant drop in its stock price,[8] Huntington's stock price essentially moved in tandem with the other regional banks in Huntington's geographic footprint over the Class Period. *See Stock Drop Cases on the Rise Due to Credit Crisis Managing*, Inst. of Mgmt. & Admin. Managing 401(K) Plans, Human Resources, Vol. 2008 No. 11 (Nov. 2008) ("As several powerful players in the financial world face pressure and even bankruptcy in the midst of a subprime mortgage and lending crisis, employer "stock drop" cases–popular after *Enron Corp.*[9] and *WorlCom Inc.*[10] disasters–are on the rise.").

Second, the circumstances present in the instant action did not trigger Defendants' duty

---

[8]Since the Amended Complaint was filed, Huntington's stock has traded as high as $12.75 per share and is up more than 46 percent overall. In addition, although Huntington has experienced fluctuations in its stock price, as is illustrated below, Huntington's stock price essentially moved in tandem with the other regional banks in Huntington's geographic footprint over the class period.

[9] *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 284 F. Supp.2d 511 (S.D. Tex. 2003).

[10]*In re WorldCom, Inc.*, 263 F. Supp.2d 745 (S.D. N.Y. 2003).

to investigate whether Huntington stock continued to be an appropriate investment and investment offer. ERISA imposes no duty on plan fiduciaries to continuously audit operational affairs. Rather, courts have held that a duty to investigate only arises when there is some reason to suspect that investing in company stock may be imprudent--that is, "there must be something akin to a 'red flag' of misconduct." *Tribune*, 521 F.3d at 700 (citing *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 & n.4 (9th Cir. 1995)). This Court agrees with Defendants that Plaintiffs do not point to any "red flags" that should have placed Defendants on notice of a need to cease offering the Huntington stock to Plan participants or to liquidate the Stock Fund. Instead, Plaintiffs cite to news articles and other documents that discuss the United States housing market and mortgage foreclosures. *See* Amended Complaint ¶¶ 87-98, 145. This type of general news information is not the type courts have found to be sufficient to trigger the duty to investigate. *See* Tribune, 521 F.3d at 700 (purported specific improper accounting practices found to be insufficient); *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397 (9th Cir. 1995) (plan administrator's actual knowledge of suspicious conduct relating to plan funding found to be sufficient); *cf. Steavens v. Electronic Data Sys. Corp.*, 44 Employee Benefits Cas. 2657, 2008 WL 3540070, at *4-5 (E.D. Mich. Aug. 12 2008) (ERISA defendants did not have a duty to investigate certain information because an ERISA fiduciary is under no obligation "to regulate purely corporate behavior"). Again, the Court concludes that Plaintiffs' Amended Complaint merely sets out the "formulaic recitation of the elements" of their breach of fiduciary duty cause of action related to Defendants' alleged duty to investigate, leaving it conceivable; however, completely implausible. *See Twombly*, 127 S.Ct. at 1964-65.

Last, Plaintiffs' allegations that "Defendants knew or should have known the extreme

15

risk of subprime lending because of their positions at the company and because it was publicized by the financial and popular press" are insufficient to factually support the contention that they knew or should have known that they were required to investigate the continued offering and holding of Huntington stock.  *See Tribune*, 521 F.3d at 700  (it must be alleged that each defendant was in a position to know or learn of the information, that is, a "conclusory statement that all defendants should have known specific facts about a company is generally insufficient to state a claim").  *See also Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1089-92 (N.D. Ill. 2004) (collecting cases finding that allegations that a defendant was a member of a plan's investment committee is an insufficient basis for inferring that he should have been privy to certain company information).  Plaintiffs' allegations that public knowledge of the future of the subprime lending market was such an extreme risk does nothing to change the Court's conclusion.  Defendants cannot be held to a standard that would require them to predict the future of the financial markets so as not to breach their fiduciary duties under ERISA.

As mentioned above, it is clear that the federal courts are currently experiencing a significant rise in "stock drop cases" due to the current status of the Stock Market and the economic climate in general, which of course includes the subprime lending crisis.  However, ERISA was simply not intended to be a shield from the sometimes volatile financial markets.

Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss Count I in its entirety.

## B.  Count IV - Breach of Fiduciary Duty Based Upon Misrepresentation[11]

---

[11]The Court notes that the Amended Complaint alleges as part of Count I and Count IV that Defendants have failed "to implement and maintain risk management control processes," and they failed "to properly reserve for losses."   The conduct encompassed in the risk

16

Count IV of the Amended Complaint alleges that Defendants violated Sections 404 and 405 of ERISA, 29 U.S.C. §§ 1104, 1105, by failing to provide complete and accurate information to the participants in the plans. It is well settled that "a fiduciary may not materially mislead those to whom the duties of loyalty and prudence described in 29 U.S.C. § 1104 are owed." *In re Cardinal Health ERISA Litig.*, 424 F. Supp.2d at 1043. To establish a claim for breach of fiduciary duty based on alleged misrepresentations, a plaintiff must show that: (1) defendant was acting in a fiduciary capacity when it made the challenged statements; (2) the statements constituted material misrepresentations; and (3) plaintiff relied on them to his/her detriment. *Id.* (citing *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002).

---

management allegation has been found to be sufficient to survive a motion to dismiss. *See e.g., Shirk v. Fifth Third Bancorp*, Case No. 05-cv-49, 2007 U.S. Dist. LEXIS 26534, at *11 ("In further support of their claims that Defendants mishandled the internal operations of the Company, Plaintiffs allege that on March 26, 2003, Fifth Third entered into an agreement with regulatory agencies to dramatically reconstruct its entire system of internal controls. Plaintiffs state that at no time prior to the disclosure of the agreement were investors informed of the depth or severity of Fifth Third's lack of internal financial controls or the risk to investors flowing from those absent controls entering the agreement."). And, the loss reserve allegation has been raised in other ERISA cases. *See e.g., Tribune*, 521 F.3d at 700 (dismissing ERISA claims stemming from $95 million charge taken against earnings; whether a problem existed "and was eventually discovered says nothing about whether the defendants were on notice of potential problems beforehand"); *Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (allegation that bank failed to establish adequate reserves for loan losses "in essence tr[ies] to penalize banking institutions for failing to show greater clairvoyance") (quotation omitted).

In the instant action, these allegations cannot survive Defendants' Motion to Dismiss. That is, these allegations are simply labels–Plaintiffs offer no factual support for them. Moreover, similar to the conflict of interest issue addressed earlier, in their motion to dismiss Defendants request dismissal of these allegations to the extent that they are meant to state a claim upon which relief can be granted and Plaintiffs (again, understandably so) simply do not respond to Defendants arguments. *See* Fed. R. Civ. P. 56(e) (non-moving party cannot rest on its pleadings or merely reassert its previous allegations). Thus, to the extent that Plaintiffs intend to rely upon these allegations to factually support their breach of fiduciary duty claims, the allegations do not "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true," and cannot survive Defendants' Motion to Dismiss. *Twombly*, 127 S.Ct. at 1964-65.

Other courts have also deemed it unlawful for a fiduciary to miscommunicate affirmatively or to mislead plan participants about material matters regarding the plan. *Id.* (citing *AEP ERISA Litig.*, 327 F. Supp. 2d 812, 831 (S.D. Ohio 2004); *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 555 (S.D. Tex. 2003). " '[T]the duty to inform is a constant thread in the relationship between the beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'" *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 548 (6th Cir. 1999) (quoting *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d. Cir. 1993)).

In the instant action, Plaintiffs allege that Defendants breached their fiduciary duties through untimely disclosure of Franklin Credit's lending practices, as it provided "no meaningful accounting to plan members." Further, Plaintiffs allege that Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Huntington's "serious mismanagement" and "improper business practices and public misrepresentations," and the consequential "artificial inflation" of the value of Huntington stock, and, generally, by conveying incomplete information regarding the soundness of Huntington stock and the prudence of investing and holding retirement contributions in Huntington equity.

Defendants argue that Plaintiffs completely fail to address Huntington's repeated and specific disclosures concerning credit and market risk. In addition, Defendants contend that plaintiffs have not supported their wholly conclusory allegations related to Defendants' alleged misrepresentations. Defendants arguments are, again, well taken.

Defendants recite numerous specific public disclosures that Huntington made regarding its potential exposure to credit and market risk both before and throughout the Class Period.

18

(Doc. # 48 at 36-40.)  Defendants disclosures show clearly that Huntington regularly warned investors that it was not immune to the effects of market turmoil.  (*See* Huntington Form 10-K for year ending 12/31/06, filed with the SEC on 2/22/07) ("Like all banks, we are subject to the effects of any economic downturn, and in particular, a significant decline in home values in our markets could have a negative effect on results of operations").  They further indicate that Huntington disclosed the fact that it "like other financial companies, [was] subject to a number of risks, many of which are outside of [its] direct control," such as "(1) credit risk[s], which is the risk that loan and lease customers or other counter parties will be unable to perform their contractual obligations, (2) market risk[s], which is the risk that changes in market rates and prices will adversely affect our financial condition or results of operation . . . ."  (Huntington Form 10-Q for period ended on 6/30/07, filed with the SEC on 8/9/07 at 25; Huntington Form 10-Q for period ended 9/30/07 at 42-44) (detailing market risks and liquidity risks).

In addition to warning investors about general market risks, Huntington specifically disclosed its exposure to the subprime, housing, and construction markets and frequently discussed the effect of increasing market turmoil.  For example, Huntington explained that "there has been a general slowdown in the housing market" and that Huntington had increased its reserves as a result.  (*See* Huntington Form 10-Q for period ended 6/30/07 at 50; Huntington Form 10-Q for period ended 9/30/07 at 33).

Huntington also unequivocally disclosed its relationship with Franklin Credit.  On August 17, 2007, Huntington publicly filed a "Third Quarter Analyst Handout" that specifically discussed Huntington's exposure to Franklin Credit and the subprime loan market.  In a slide titled "Franklin Credit (FCMC) Relationship," Huntington disclosed that it has a commercial

lending relationship with Franklin, an entity that "[a]cquires and services 'scratch and dent' mortgage loan pools" and "originates sub-prime mortgages" through its wholly-owned subsidiary, Tribeca Lending Corporation. (8/17/07 Huntington Form 8-K at 27). Huntington further disclosed that its loans to Franklin Credit were "commercial loans and warehouse lines of credit secured by the underlying 30,000 individual mortgage loans." *Id.* Huntington also disclosed that, in the event of default by Franklin Credit, the mortgages would be assigned directly to Huntington. *See id.*

Similarly, in its 10-Q filed after the end of the third quarter 2007, Huntington again disclosed the risks it faced in the subprime, housing, and construction markets. That third quarter Form 10-Q, filed with the SEC on October 26, 2007, discussed the relationship with Franklin at length. (*See* Huntington Form 10-Q for period ended 9/30/07 at 33-34). That filing disclosed, among other things, the long-term nature of the relationship, Franklin's business model, and the amount and nature of Huntington's exposure. Huntington stated that its "term debt exposure is in the form of over 400 individually underwritten commercial loans used to fund over 30,000 individual first- and second-priority lien residential mortgages," and that as of September 30, 2007, "no commercial loans to Franklin were classified as 30-day delinquent or nonperforming, and there have been no net charge-offs related to these facilities for the first nine months of 2007." *Id.* at 33. Huntington explained that there "has been a general slowdown in the housing market across our geographic footprint, reflecting declining prices and excess inventories of houses to be sold, particularly in our eastern Michigan and northern Ohio markets. As a result, homebuilders have shown signs of financial deterioration." *Id.* Huntington also discussed the steps it was taking "to mitigate the risk arising from this exposure." *Id.*

Similarly, Huntington's 2007 Form 10-K extensively disclosed the risks it faces, devoting four pages to providing detailed information on credit risks stemming from the Franklin relationship and the housing industry, as well as discussing its market risk and liquidity risk. (*See* Huntington Form 10-K for year ending 12/31/07, filed with the SEC on 2/26/08). Huntington explained that "there can be no assurance that we will not incur further losses relating to the Franklin relationship," that "[d]eclines in home values and reduced levels of home sales in our markets could continue to adversely affect us," and that "[t]he allowance for loan losses may prove inadequate or be negatively affected by credit risk exposures." *Id.*

Huntington's disclosures on the subprime, housing, and construction markets have continued throughout 2008. (*See e.g.,* Huntington Form 10-Q for period ended 3/31/08, filed with the SEC on 5/9/08, at 26-27) (discussing risks associated with its loans to Franklin Credit and loans to single family home builders including a detailed breakdown of the Franklin Credit loans and the fact that "the housing market across our footprint remains stressed"); (Huntington Form 10-Q for period ended 6/30/08 at 32-33) (identifying both the loans to Franklin Credit and loans to single family homebuilders as noteworthy segments of its commercial loan portfolio and discussed them in detail).

Plaintiffs argue that Defendants have raised issues of fact that are inappropriate to address on a motion to dismiss. This Court, however, disagrees. For although Plaintiffs have again set forth the appropriate "labels and conclusions" in their Amended Complaint, these allegations are merely a "formulaic recitation of the elements of" this breach of fiduciary duty cause of action and therefore, cannot survive Defendants' Motion to Dismiss. *See Twombly*, 127 S.Ct. at 1964-65. Indeed, Plaintiffs cannot satisfy their pleading burden by ignoring the content

of the disclosures and conclusorily asserting that they were incomplete. *See In re Bausch &*
*Lomb Inc. ERISA Litig.*, No. 06-CV-6297, Slip Op. at 17-20 (W.D.N.Y. Dec. 12, 2008); *Smith v.*
*Delta Air Lines, Inc.*, 422 F. Supp.2d 1310, 1333 (N.D. Ga. 2006). Plaintiffs must identify the
additional information they claim was required to be disclosed and provide a basis for that
assertion. *See Twombly*, 127 S. Ct. at 1965-66. Conclusory allegations do not suffice, absent
"further factual enhancement," to propel plaintiffs' Amended Complaint across "the line
between possibility and plausibility of entitlement to relief." *Id.* at 1966.

## C.  Count II - Duty to Monitor, Count III - Duty to Disclose to Co-Fiduciaries, Count V - Co-Fiduciary Liability

In Count II, Plaintiffs allege that the individual defendants who were responsible for the
selection, monitoring, and removal of the Plan's other fiduciaries failed to properly monitor the
performance of their fiduciary appointees and remove and replace those whose performance was
inadequate, as well as provide them with the necessary information to fulfill their fiduciary
duties. In Count III, Plaintiffs allege that Defendants with knowledge of the risks associated
with Huntington stock breached their duty to disclose necessary information to co-fiduciaries.
Finally, in Count V, Plaintiffs allege that Defendants breached their duties and responsibilities as
co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and
loyal management, adequate monitoring, and complete and accurate communications to
co-fiduciaries and Plan participants and beneficiaries.

Defendants argue that because Plaintiffs have not adequately pleaded the existence of any
underlying fiduciary breach, these tag-along claims fail as well. This Court agrees.

Counts II, III, and V fail for the same reasons as the underlying prudence and
misrepresentation claims. That is, because plaintiffs do not adequately plead the existence of

any underlying fiduciary breach. *See, e.g.*, 29 U.S.C. § 1105(a) (predicate of co-fiduciary liability is a "breach of fiduciary responsibility of another fiduciary with respect to the same plan").

**D. Request for Oral Argument**

Pursuant to the Local Rules for the Southern District of Ohio, parties may apply to the Court for oral argument if "oral argument is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." S.D. Ohio Civ. R. 7.1(b)(2). Parties apply "by including the phrase 'ORAL ARGUMENT REQUESTED' (or its equivalent) on the caption of the motion or on a memorandum." *Id.* The parties must also "succinctly explain[]" the grounds for such request. *Id.* "If the Court determines argument or a conference would be helpful, the Court will notify all parties." *Id.* Whether to grant or deny oral argument is left to the sound discretion of the trial court. *See Whitescarver v. Sabin Robbins Paper Co.*, Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, *5-6 (S.D. Ohio July 27, 2006).

After careful review of Defendants' Motion to Dismiss, the Court finds that oral argument is not essential to the fair resolution of the case. Although ERISA cases in general are complex and of public importance, there is nothing unusual in the instant action that causes it to be exceptionally complex or of significant public importance.

Accordingly, the Court **DENIES** Plaintiffs' Request for Oral Argument on Defendants' Motion to Dismiss. (Doc. # 63.)

**IV. Conclusion**

For the reasons set forth above, the Court **GRANTS** Defendants' Motion to Dismiss (Doc. # 48) and **DENIES** Plaintiffs' Request for Oral Argument on Defendants' Motion to

Dismiss (Doc. # 63). The Clerk is Directed to enter **FINAL JUDGMENT** in this action in accordance with this Opinion and Order.

      **IT IS SO ORDERED**.

                                             **/s/ Gregory L. Frost**
                                        **GREGORY L. FROST**
                                        **UNITED STATES DISTRICT JUDGE**